REID, Judge.
Plaintiff, Dewey Jenkinson, brought this suit under the Workmen’s Compensation Act against Guy Clemons and Hurshel Clemons, doing business as Clemons Bros. Lumber Co., employer and John W. Fisk Company, the alleged Workmen’s Compensation insurer of Clemons Bros. Lumber Co., seeking compensation benefits for injuries said to have been received on or about August 2, 1959, claiming that said injuries aggravated an existing heart condition. Suit was filed on November 7, 1959, was partially tried on November 14, 1960 before the late Honorable Woodrow W. Overton, who subsequently died before completion of the trial, the case having been left open for the taking of testimony of several witnesses, and the trial was completed on November 11, 1961. By agreement of counsel the case was submitted on the transcript of the record. Judgment was rendered on September 11, 1961, dismissing plaintiff’s suit at his cost, which said judgment was read and signed on Sep *182 tember 13, 1961, without written reasons, and from this judgment plaintiff has moved for this appeal.
The record shows that the plaintiff had worked for the defendant, Clemons Bros. Lumber Co., off and on over a period of 20 years, and at the time of the alleged accident was employed at the defendant’s plant in Amite, Louisiana, as a fireman. Plaintiff’s duties included repairing breakdown of furnaces, which said repairs sometime necessitated plaintiff entering the furnaces. He testified that on August 2, 1959, which was supposedly his day off, he was called on to fix a furnace which needed repairs. He testified that he worked approximately 10 hours on August 2nd but that he did not have sufficient materials to complete the job so he had to return the next day after his regular shift and complete the repairs. He further testified that the furnace was hot, that he became dizzy and had cramps in his legs and felt that he could not finish the job; that each day thereafter he felt sensations of weakness, flutterings in his chest and dizziness, all of which he alleged he had never had prior to August 2, and that as a result of all of this a pre-existing heart condition was aggravated and that the aggravated heart condition has rendered him totally and permanently disabled.
The plaintiff’s wife testified that up until the time of the alleged accident on August 2nd the plaintiff had never had any of the symptoms complained of but that since that time he had had trouble breathing, had been dizzy and had severe cramps in his legs.
Except for the testimony of the plaintiff as to the alleged accident and the testimony of plaintiff’s wife to the effect that he had been in good health prior to the date of the alleged accident, the record is almost completely void of evidence of any injury. It is true that the plaintiff testified that he had informed two fellow workers of his condition, namely John Carr and Leroy Stevenson, but an examination of the testimony of these two men shows that they had no actual knowledge of any accident of any kind. John Carr said:
“Q. Do you remember any incidents that happened about that time that were connected with why he quit ?
“A: I don’t know of anything particular only he told me one Monday morning, I got in there and he didn’t do very much work, I don’t know did he work any after he was sick. He spoke and said he was sick.
“Q: Did he tell you what was the matter with him?
“A: He spoke and told me that he was sick, he got too hot but I just went on by him, he was sitting on some little steps down there and I went on by him and went on up in the house.
“Q: Who did his work that Monday?
“A: He stayed on and worked that day he was there he worked.
“Q: Did he work like he normally worked ?
“A: Shore, he worked like he normally worked, he just went on and' did his work.
“Q: Was he as spry as ever?
“A: I don’t know exactly because I didn’t stay there all the morning. I didn’t know how he got around but he stayed and finished out the day.”
Leroy Stevenson testified that one day when he and the plaintiff were cleaning out the furnace the plaintiff told him that “he got too hot one day at 12 o’clock that is all he told me.”
On the other hand, there was a great deal of evidence produced at the trial' which would substantiate the trial judge’s decision in this matter. The record is clear, and the plaintiff testified that he had not reported an accident to Mr. Abernathy,, *183 his immediate superior, not to Mr. Clemons. The record further shows that although the plaintiff alleged he was injured on August 2, 1959, the payroll records of Clemons Bros. Lumber Co. indicate that he worked four weeks during the month of August, 1959, actually working 48 hours in the week ending August 4, 1959 and 54 hours in the week ending August 11, 1959, and 48 and 31 hours, respectively, for the third and fourth weeks of that month; that he worked four weeks during the month of September and two weeks during October, and 29 hours during the first week in November.
Mr. Hurshel Clemons’ testimony concerning the question of whether or not the plaintiff had notified him of the alleged injury is as follows:
“Q: Has Mr. Jenkinson at any time since August particularly 1959, requested any kind of assistance from you, and if so, what? Particularly I have reference, did he come in and make any complaint about being hurt or injured or anything else on the job and ask for Workmen’s • Compensation?
“A: He told the mill foreman he was short of some time and the mill foreman told him as far as he knew he ' was paid for all of his time, and he came and told me, and I told the mill foreman to pay him whatever he said, not to let him leave without being paid for whatever he said if it run short to go ahead and pay him anyway.
“Q: In other words if he said he was short to pay him for it?
“A: That is right.
“Q: Did you pay him off or did he quit?
“A: He just quit, he said he was sick.
“Q. Did he at any time make any claim from you for Workmen’s Compensation ?
“A: No.
“Q: Did he ask to be placed on Unemployment Compensation ?
“A: Yes, he asked me that in front of a boiler one morning about unemployment.” (TR. 119, 120)
Mr. Clemons further testified:
“Q: Did he at any time make any request of you for compensation payments ?
“A: Yes, he asked me one day.
“Q: Was that for Workmen’s Compensation or for this State Unemployment Compensation?
“A: Unemployment, let him draw Social Security, Unemployment.
“Q: Was that after he left work or before?
“A: That was while he was working.
“Q: What did you tell him?
“A: I told him, no, it wasn’t legal to do that, he could just get on the Welfare.
“Q: Did he want to quit work and draw the unemployment?
“A: Yes, he wanted to lay off a few months.
“Q: And draw the unemployment compensation ?
“A: A man is not entitled to unemployment except if they are discharged or laid off, in other words, a man can’t just walk off and walk up to you and tell you he just wants to lay off a few weeks and draw unemployment.
“Q: Did Mr. Jenkinson ever complain to you of having severe cramps in his arms and legs?
“A: No, the only thing he told me he said he had been to the doctor and the doctor said he was too fat and he *184 had to lay off and lose some weight and he would just like to lay off and draw unemployment.”
There is no evidence introduced at the trial which would indicate that the furnace on which Mr. Jenkinson was working at the time of the alleged accident was unusually hot, nor was there any evidence that he had performed any unusual strenuous task, nor was there any evidence of any sudden strain, accident or injury. In fact John Carr testified that the furnace upon which Mr. Jenkinson had been working on the Sunday and Monday in question had been shut down Friday night and that if customary procedures were followed it would not have been fired up prior to its being worked on on Sunday. The plaintiff introduced 'no evidence to rebut this testimony and failed to produce any evidence to show that the furnace had not been cooled on Friday. The record further shows that the plaintiff had one or more helpers with him during this time in question but there was no testimony by any such helper that the plaintiff had suffered any injury. We thus have a situation wherein the only evidence as to the fact that the alleged accident occurred is the plaintiff’s own testimony, which testimony is contradicted by the facts that he made no attempt to notify his employer of any injury and that he continued working for some months after the alleged accident.
In regard to the medical testimony, four doctors testified at the trial. Without going into a great discussion of the medical testimony, the sum and substance of that testimony was to the effect that the plaintiff had not suffered a heart attack but was suffering from a pre-existing heart condition and an enlarged heart.
Dr. Rosen of Amite, Louisiana, apparently was the first of the physicians to examine the plaintiff after the alleged accident. He had treated plaintiff in the past. He examined the plaintiff on September 30, 1959, almost two months after the date of the alleged accident. His diagnosis was hypertension, obese heart disease, and he testified that he felt that the factors of overweight and heredity were the prime factors contributing to the plaintiff’s condition. He greatly discounted heat as a contributing factor to plaintiff’s condition.
Dr. Sharp, another local physician who had treated the plaintiff in the past, testified that he saw the plaintiff on October 1, 1959 and the plaintiff told him “that he had become overheated and become dizzy, weak and unable to stand at times in August of 1959; had muscle cramping at night from ankles to hip, difficulty in sleeping and generalized weaknesses, but I might say again that the reason he came was for— to see if I thought he would be eligible for assistance because of the way he felt.” When asked by counsel for plaintiff why the plaintiff had come to see him on October 1, 1959 Dr. Sharp said on page 18 of the testimony as follows:
“A: He came to see me to see if he would be eligible for aid or assistance from the welfare program, was the primary reason. He said he needed assistance at the time.”
He further testified that he did not examine plaintiff for a heart condition, although he did state that in the course of a routine examination he found some evidence of an enlarged heart. However, there is nothing contained in Dr. Sharp’s testimony which would in any way show that he had found any evidence that the plaintiff had suffered any injury to a preexisting heart condition. Dr. Sharp further testified that it was his belief that the plaintiff was an early diabetic.
Dr. Stotler, a heart specialist from Baton Rouge, examined Mr. Jenkinson in his office in Baton Rouge on November 29, 1959. His diagnosis was arterio-sclerotic coronary artery disease with angina pectoris. He stated that in his opinion the plaintiff did not have a heart attack but that his heart was in such an unhealthy state that strenuous work in overheated conditions could have aggravated his condition a.nd *185 could have brought about the plaintiff’s present condition. He further stated that based upon the history given him by the plaintiff he felt that what the plaintiff contended occurred on August 2nd and 3rd had brought about a congestive heart failure. However, it should be pointed out that Dr. Stotler’s diagnosis is based solely and simply upon the happenings of said events as told him by the plaintiff nearly four months after the alleged accident and Dr. Stotler further testified that this same condition could have developed without the plaintiff doing any work.
Dr. Gordon, another heart specialist of Baton Rouge, diagnosed the plaintiff as having arteriosclerosis and stated that at the time he examined the plaintiff on March 29, 1960, the plaintiff did not have congestive heart failure, nor was there any evidence of cardiac occlusion, coronary thrombosis, but he did find a diseased heart which had developed over a period of years. He further testified that it would be impossible to tell objectively whether or not a person did or did not have heart failure on August 3, 1959 except by the man being examined at that time and that any other diagnosis would be subjective, being based on statements by the plaintiff as to what happened.
In a compensation case, as in other cases, the plaintiff bears the burden of proof, and he is required to establish his claim with reasonable certainty by a preponderance of the evidence. Burk v. Gulf Refining Co. of Louisiana, La.App., 2 Cir., 171 So. 135; Dours v. Travelers Ins. Co., La.App., 1 Cir., 48 So.2d 817; Caldwell v. Caldwell, La.App., 2 Cir., 55 So.2d 258; Roberts v. M. S. Carroll Co., La.App., 2 Cir., 68 So.2d 689; Fontenot v. Camden Fire Insurance Ass’n, La.App., 3 Cir., 124 So.2d 640; Johnson v. Cloud, La.App., 3 Cir., 125 So.2d 478; Pellican v. Ashy Construction Co., La.App., 3 Cir., 127 So.2d 812; Bailey v. American Casualty Company of Reading, Pa., La.App., 131 So.2d 220.
There is also a well established principle in compensation cases that under the jurisprudence of this State, a workmen’s compensation claimant can prove the occurrence of an accident by his own testimony, however, there also can be no dispute that such evidence is sufficient to establish an accident only if there is nothing to discredit plaintiff’s testimony and only if his testimony is corroborated by the surrounding circumstances. This rule is treated in great detail in Guilbeaux v. Trinity Universal Insurance Company, La.App., 134 So.2d 717.
The trial judge in this case in rendering judgment against the plaintiff would have had to conclude that the plaintiff had failed to establish that an accident had occurred as alleged. In view of the record in this case and in view of the jurisprudence of this State, we cannot see that the court erred in arriving at its conclusion.
An examination of all of the medical testimony in the present case places this case within the ruling set forth in the case of Nickelberry v. Ritchie Grocer Co., 196 La. 1011, 200 So. 330, wherein the Supreme Court held:
“ * * * The mere fact that a workman develops heart disease while employed by another does not entitle him to compensation. The employer is not the insurer of his employees. There must be an accident to furnish the basis of any such claim, that is to say, something sudden, undesigned or unexpected and that accident must either cause or aggravate the disease which is the cause of the disability.”
This doctrine has been reiterated many times by the Louisiana Appellate Courts and as stated in the case of Prejean v. Bituminous Casualty Corporation, La.App., 125 So.2d 221. See also Seals v. City of Baton Rouge, La.App., 94 So.2d 478; Hastings v. Homewood Development Company, La.App., 84 So.2d 883; Keene v. *186 Carraway & McDougald, La.App., 95 So. 2d 849.
In view of all of the foregoing, we cannot say that the trial judge was in error in holding as he must have held that the plaintiff not only had not proved by preponderance of the evidence that there was an accident, but he failed to prove that his existing disability, if any, in any way resulted from the alleged accident or injury which he allegedly sustained.
Judgment affirmed.